**ATTACHMENT A**
**Environmental Compliance Plan**

PURSUANT TO PLEA AGREEMENT

**United States v. INTERUNITY MANAGEMENT (DEUTSCHLAND) GMBH ("INTERUNITY")**

The following standards and requirements for an ENVIRONMENTAL COMPLIANCE PLAN (ECP) have been prepared pursuant to the Plea Agreement between INTERUNITY MANAGEMENT (DEUTSCHLAND) GMBH (hereinafter "INTERUNITY") and the United States (hereinafter "Government") filed in the United States District Court for the Southern District of California. Compliance with all of the standards and requirements of the ECP is an essential term of the Plea Agreement.

The ECP includes various provisions to ensure that all vessels owned, operated, and/or technically managed, by INTERUNITY that call on ports of the United States comply with all applicable maritime environmental requirements established under applicable international, flag state and port state law, including, but not limited to the International Convention for the Safety of Life at Sea (SOLAS), the International Safety Management (ISM) Code, the International Convention for Prevention of Pollution from Ships (MARPOL), and all applicable Federal and state statutes and regulations including, but not limited to, the Ports and Waterways Safety Act (PWSA), the Act to Prevent Pollution from Ships (APPS), the Clean Water Act (CWA), and the Oil Pollution Act of 1990 (OPA 90), and with the requirements of this agreement itself. The auditing requirements of this ECP apply to all vessels that are owned, operated, and/or technically managed, by INTERUNITY which call at U.S. ports. As more fully set forth below, this ECP and its requirements will also apply to vessels that INTERUNITY acquires or assumes management of during the period of probation and will call at U.S. ports during the term of probation.

The Covered Vessel(s) as of the date of signing of this ECP are:

1. Aramis            9438391
2. Chiquita Passion  9399765
3. Chiquita Dream    9399777

## A.   APPLICABILITY/PURPOSE

(1)   This ECP shall cover and apply to all of INTERUNITY operations involving seagoing vessels calling on United States ports which are operated, and/or

1

technically managed by INTERUNITY on the date of sentencing (as set out above) and at any time during the period of probation. Such vessels shall include all vessels that will call at U.S. ports (hereafter referred to as the "Covered Vessels").

    (2)    The ECP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation. The purpose of this ECP is to augment the requirements of existing law by increasing and improving inspections, reviews, and audits of INTERUNITY operated and/or managed vessels, shore side facilities, and operations involving said vessels; increase training of all INTERUNITY personnel involved with said vessels; develop and implement management and engineering controls to better manage, detect and prevent environmental violations; and require periodic reports to the United States Probation Office for the Southern District of California, the United States Attorney's Office for the Southern District of California, the Environmental Crimes Section of the United States Department of Justice, and the United States Coast Guard (collectively hereinafter "the United States") to ensure that INTERUNITY is following the requirements of this ECP and that all of its Covered Vessels comply with all applicable maritime environmental requirements established under applicable international, flag state, and port state law and all applicable Federal and state statutes and regulations, and that an effective environmental management system is in place to prevent recurrence of violations.

## B.    COMPLIANCE MANAGER

    (1)    Within sixty (60) days of entry of the Plea Agreement, INTERUNITY shall designate a Compliance Manager (hereinafter "CM") who shall report directly to the Managing Director ("MD") of INTERUNITY. INTERUNITY shall provide the name of the CM to the United States. The CM could be the same individual as INTERUNITY's "designated person" under the ISM Code unless reasons are provided to the United States justifying why the "designated person" should not also be the CM. The CM shall be responsible for coordinating with the Third Party Auditor (hereinafter "TPA"), as more fully described below, developing and implementing all of the procedures and systems required herein, establishing and implementing training programs for the officers and crew of INTERUNITY operated and/or managed vessels, ensuring that reviews, audits and surveys are carried out as required and ensuring that all documents are properly maintained and that reports are made on a timely basis to the Court Appointed Monitor (hereinafter "CAM") and the United States. All reports required under this ECP shall be reviewed by the CM and signed under the penalty of perjury.

    (2)    INTERUNITY shall establish a procedure and reporting system that requires and enables all officers, crewmembers and employees, and shore side personnel involved in the operation of INTERUNITY's Covered Vessels, including all persons working for INTERUNITY, its subsidiaries, affiliated business entities

(owned wholly or partially by INTERUNITY) and agents of INTERUNITY as either direct employees or independent contractors, to notify the CM of all violations of any applicable environmental requirements or other requirements of this ECP and to cooperate fully with the CAM and the United States in carrying out the reviewing, auditing and oversight functions required by applicable law and this ECP. INTERUNITY agrees to establish a procedure that makes failure to notify the CM of any violations of any applicable environmental requirements and failure to cooperate fully with the Classification Societies, the CAM and the United States in carrying out their auditing and oversight functions required by applicable law and this ECP, grounds for dismissal. INTERUNITY agrees not to retaliate against any officer, crewmember, employee, or shore side personnel involved in the operation of INTERUNITY seagoing vessels, including all persons working for INTERUNITY, its subsidiaries, affiliated business entities (owned wholly or partially by INTERUNITY) and agents of INTERUNITY as either direct employees or independent contractors or any entity making any such report.

(3)    The CM shall be authorized to access all records and personnel regarding all vessels subject to the ECP for the purpose of ensuring compliance with the ECP. The CM shall be authorized to implement all requirements of the ECP on all vessels subject to the ECP. The CM shall ensure that audits and surveys are carried out as required, that all documents are properly maintained and that reports are made on a timely basis to the U.S. Probation Office, CAM, the designated representative of the Coast Guard, and INTERUNITY. The CM position will be filled by an individual(s) with significant maritime vessel operational background, who possesses auditing experience and is thoroughly familiar with the requirements of this ECP, and is knowledgeable about domestic and international maritime environmental laws and regulations.

**CM Responsibilities:**

(a)    Development and Maintenance of Effective Training Programs

-    The CM will be responsible for developing training programs to educate and train INTERUNITY employees on their environmental commitment, the requirements of the ECP, the policies and procedures for complying with the ECP, and the possible consequences to INTERUNITY and to individuals for failure to comply with environmental laws.

-    The CM shall also provide environmental consultants and contractors of INTERUNITY involved in the operation of covered vessels with documents and training to make them aware of this ECP and its requirements.

(b)    Auditing and Compliance Assessment

\-      Verify that the TPA conducts the review and audits required by the ECP and that the required reports are prepared.

(c)      Fleet Reviews

\-      Supervise annual overall reviews of the environmental compliance program and "focused" reviews of key environmental areas to promote the adoption of "best practices".

(d)      Reporting of Non-Compliance by Employees and Crew Members

\-      Establish a means by which employees may report (anonymously if the employee so desires) issues of non-compliance with this ECP and any other procedure, policy, or regulation associated with environmental protection. The CM shall review, investigate, and document in a timely fashion reports of non-compliance received from employees and shall initiate, monitor, and document all actions taken as a result of such reports. The CM shall maintain records of such reports and action taken, and shall make them available for review by the TPA and the CAM.

## C.      MASTER AND CHIEF ENGINEER

(1)      The Master of each of INTERUNITY vessel subject to this ECP shall ensure that prompt reports are made to the CM of any non-compliant condition associated with environmental protection of any covered INTERUNITY vessel.

(2)      The Chief Engineer on board all vessels subject to this ECP shall perform the following duties regarding this ECP:

\-      Daily measure, monitor, record and manage shipboard generated wastes generated by engineering operations;

\-      Report to the CM and cooperate with INTERUNITY to resolve environmental concerns, such as inoperative or ineffective pollution prevention equipment and document all efforts to do so in a log that is available for review and audit.

## D.      THIRD PARTY AUDITOR

(1)      During the probationary period, a TPA shall conduct the audits and submit the reports described in this ECP. Within sixty (60) days of sentencing, INTERUNITY shall submit to the Government a list of three (3) qualified candidates for the TPA position along with its recommendation for approval of one of the candidates, from which the Government will select a candidate to serve as the TPA. To the extent

4

practicable, INTERUNITY will endeavor to submit candidates that have not provided auditing services to INTERUNITY within the last calendar year prior to the U.S. Coast Guard boarding of the M/V DONALD that initiated the investigation which ultimately led to the plea agreement in this case, or is not associated with the Classification Societies or Flag Administrations to which the Covered Vessels are classed or registered. In the event that none of the candidates is found acceptable, or if the work of the TPA is unsatisfactory at any time, the Government may request that INTERUNITY supply additional candidates. The Government reserves the right to reject any proposed TPA. All work performed by the TPA and its auditors must be certified as being accurate and truthful. The certification shall be made with the understanding that any false information knowingly submitted is subject to prosecution under 18 U.S.C. §1001.

(2)    Qualifications. Qualified candidates for the TPA include individuals or firms that have staff capable of applying the most current International Standards Organization ("ISO") 14000 environmental management auditing criteria and have the following experience, expertise, and capabilities:

-    expertise and competence in the regulatory programs under United States and other Marine Environmental Protection Requirements; '

-    experience in performing environmental audits in industrial or maritime environments, and;

-    sufficient expertise and competence to assess whether INTERUNITY has adequate policies, procedures, and equipment in place to ensure compliance with this ECP and to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance.

(3)    Adequacy of Staff. The TPA must have adequate staff to perform the work required of this ECP. Due to the in-depth nature of the audit criteria, persons with specialized knowledge and experience will be required to perform the audits. The knowledge, skills and abilities of the TPA and staff must align with the criteria of the audits. Experienced personnel with extensive operational, maintenance and repair of shipboard and machinery space systems, equipment, and components is a prerequisite. The TPA shall employ at least one senior level Marine Engineer (Chief, First or Second Engineer) to perform shipboard machinery space audits. The TPA shall provide the Government with the resumes of the TPA's auditors assigned to conduct shore-side and vessel audits.

(4)    Contractual Independence. During the term of probation, the TPA shall not directly own any stock in INTERUNITY; must have no other ongoing contractual or business relationship, other than that of the TPA, with INTERUNITY; and may not seek or serve in other capacities with INTERUNITY, unless first disclosed to the

Government, the Court, and the CAM, and unless expressly approved by the Government. The TPA must exercise independent judgment and ensure that the objectives set forth in this ECP are met. INTERUNITY and the TPA shall notify the Government if any contractual relationships or proposed contractual relationships between INTERUNITY and the TPA arise during the term of probation.

(5)   Functional Independence. The TPA shall function independently of INTERUNITY, but may communicate with INTERUNITY about the substance of its work. At its discretion, the TPA, may share with INTERUNITY its audit checklist. The TPA may consult with, but shall not receive or request approval of any form from any employee of INTERUNITY regarding the development, clearance, or evaluation of any document, report, or communication of any kind, whether draft or final, required by this ECP.

## E.   ENVIRONMENTAL MANAGEMENT SYSTEM

(1)   The CM shall be responsible for establishing an Environmental Management System (EMS). To the extent possible, the EMS shall be based upon the ISO 14001/2015 standards and shall be part of INTERUNITY documented management system.

(2)   Environmental Policy:

-      The EMS should be based upon a documented and clearly communicated policy. This policy should set out the INTERUNITY commitment towards a cleaner marine environment. It should include:

  i.    provision for compliance with environmental requirements;
  ii.   commitment to continuous improvement in environmental performance, including those areas required by this ECP;
  iii.  commitment to pollution prevention that emphasizes source reduction, to include funding and human resources necessary to effectively maintain and repair the systems, equipment and components found in machinery and cargo (deck) spaces of vessels;
  iv.   commitment to continuous reduction of environmental risks;
  v.    commitment to sharing information with external stakeholders on environmental performance.

(3)   Communication of Environmental Requirements:

The EMS must provide a means to identify, explain, and communicate all environmental requirements, and any additional best practices or industry norms which INTERUNITY may choose to adopt, to INTERUNITY employees, and other vendors, technicians or non-crewmembers who are boarding and/or

sailing with the vessels and are engaged in the waste stream management of INTERUNITY covered vessels. The EMS must also specify procedures for incorporating changes in operations or environmental requirements into the communication plan.

(4) Objectives and Targets:

    (a)    The EMS shall establish specific objectives and targets for:

        (i)    achieving and maintaining compliance with all applicable marine environmental protection requirements and the requirements of this ECP;
        (ii)    environmental performance demonstrating continuous improvement in regulated and non-regulated areas;
        (iii)    pollution prevention that emphasizes source reduction with respect to machinery space waste streams and effective management of cargo related wastes; and
        (iv)    sharing information with external stakeholders on environmental performance against all EMS objectives and targets, upon request.

    (b)    The EMS shall establish appropriate time frames to meet these objectives and targets. These must be documented and updated as environmental requirements change or as modifications occur in activities and structures within organizations in a manner that affects environmental performance or as a result of recommendations made by the TPA.

(5)    Structure, Responsibility and Resources:

INTERUNITY will ensure that it is equipped with sufficient personnel and other resources to meet its objectives and targets. The EMS will describe in detail the procedures and steps for achieving those objectives and targets. The EMS will define the compliance roles and responsibilities of all Covered Vessels and shore side personnel involved with the operation, maintenance and repair of INTERUNITY vessels, and will indicate how they and other corporate personnel will be held accountable for achieving and maintaining compliance with this EMS and other applicable marine environmental protection requirements. The EMS will also establish procedures for receiving and addressing concerns raised by INTERUNITY employees and others regarding environmental performance and compliance.

(6)    Operational Control:

The EMS will identify and provide for the planning and management of all

of INTERUNITY operations and activities with a view to achieving the ECP objectives and targets. For example, vessel deck department and engine room machinery space maintenance and repair will be an important aspect in achieving and maintaining compliance and enhancing environmental performance.

(7)    Corrective and Preventive Action and Emergency Procedures:

(a)    INTERUNITY, through its EMS, will establish and maintain documented procedures for preventing, detecting, investigating, promptly initiating corrective action, and reporting (both internally and externally) any occurrence that may affect the organization's ability to achieve the ECP objectives and targets.

(b)    Such measures must address incidents that may have an effect on compliance with environmental requirements as well as on environmental performance in regulated and non-regulated areas, including requirements of this ECP, or other applicable marine environmental protection requirements. Examples of such situations include incinerator or oily water separator malfunctions, overflows of fuel or slop tanks, overflow of tanks within machinery spaces, fuel oil, lube oil, saltwater line failures, operator errors and other accidental releases.

(c)    The EMS must also establish documented procedures for mitigating any adverse impacts on the environment that may be associated with accidents or emergency situations. If the environmental violation or incident resulted from a weakness in the system, the EMS should be updated and refined to minimize the likelihood of such problems recurring in the future. The EMS should also, to the extent possible, provide for the testing and evaluation of emergency procedures.

(8)    Training, Awareness and Competence:

The EMS must establish procedures to ensure that all personnel (including vendors, technicians, and other non-crewmembers) who are boarding and/or sailing with the vessels and whose job responsibilities affect the ability to achieve the ECP objectives and targets, have been trained and are capable of carrying out these responsibilities. In particular, the training should highlight means to enhance the ability of such personnel to ensure compliance with environmental requirements and voluntary undertakings, the requirements of the ECP, and other marine environmental protection requirements.

(9)    Organizational Decision-making and Planning:

The EMS must describe how these elements will be integrated into the INTERUNITY overall decision-making and planning, in particular, decisions on capital improvements, training programs, and vessel operations, maintenance, and repair activities.

(10)   Document Control:

The EMS must establish procedures to ensure maintenance of appropriate documentation relating to objectives and targets and should also ensure that those records will be adequate for subsequent evaluation and improvement of the operation of the EMS. Additionally, all records will be maintained and made available to the TPA and port and flag state personnel upon request.

(11) Continuous Evaluation and Improvement:

(a)     The EMS must include methods to perform periodic, documented and objective internal auditing of the organization's performance in achieving these objectives and targets, and on how well the ECP assists the organization in achieving those objectives and targets. This requirement is independent from the auditing requirements detailed elsewhere in this plan. The goal of these internal audits and reviews will be to allow management to continuously monitor and assess vessel systems, equipment and components, and the ability and proficiency at which vessel crew members and personnel ashore comply with the policies and procedures established by this ECP.

(b)     The EMS will identify an ongoing process for assessing when a vessel is to be taken out of service for an environmental discharge related repair.

(c)     The EMS will include organization charts, as appropriate, that identify shore side and vessel individuals having environmental performance, risk reduction, and regulatory compliance responsibilities. The charts shall also specify responsibilities of Marine and Technical Superintendents to report information related to environmental releases or inadequate performance of environmental pollution protection equipment, casualties causing internal spills, excessive waste development and leaking equipment with oil-to-sea interfaces.

(d)     The EMS will promote non-retaliatory practices and ensure that employees are not punished or otherwise suffer negative consequences for reporting violations of environmental laws, regulations, or policies.

(e)     The EMS will describe potential consequences for departure from specified operating policies and procedures, including possible termination of employment, as well as criminal/civil/administrative penalties as a result of noncompliance.

(f) The EMS will make employee compliance with environmental policies of the ECP, and other applicable marine environmental protection requirements a positive factor, and failure to comply a negative factor, in all evaluations undertaken for the performance of all INTERUNITY employees.

(g)     The EMS will include policies against any incentive or bonus programs based on minimizing operational costs associated with the operation, maintenance and repair of machinery space or cargo/deck space systems, equipment and components to ensure that employees do not avoid such costs and thereby sacrifice environmental compliance.

(h)     The EMS will describe a confidential non-compliance reporting system that is adopted to ensure that employees may quickly and confidentially report discharges, spills, environmental incidents and other environmental performance data.

(i)     The EMS will identify all operations and activities where documented standard operating practices (SOPs) are needed to prevent potential violations or unplanned waste stream releases, with a primary emphasis on vessel engine room operations, systems, equipment and components and cargo residue management.

(j)     The EMS will identify the types of records developed and maintained in support of the ECP such as reports, audit working papers, correspondence, communications, reports from the confidential system for non-compliance reporting, and identify personnel responsible for their maintenance, and procedures for responding to inquiries and requests for release of information. The EMS shall provide a system for conducting and documenting routine, objective self-inspections by INTERUNITY internal auditors, supervisors, and trained staff to check for malfunctions, deterioration, and inadequate maintenance of pollution prevention equipment, worker adherence to SOPs, unusual situations, and unauthorized releases.

## F.     COURT APPOINTED MONITOR

As part of the ECP, INTERUNITY agrees to pay for a Court Appointed Monitor (hereinafter "CAM") that will report to the Court and the United States during the entire period of probation. Within sixty (60) days of sentencing, INTERUNITY will submit a list of three qualified candidates for the CAM from which the United States will select one of the candidates. Along with the list, INTERUNITY shall provide written certification that it will not employ or be affiliated with the selected monitor, the monitor's firm, or other professionals who are part of the monitorship team during the period of probation and for two years after the conclusion of probation. In the event that the United States does not find one of the candidates satisfactory, it may request INTERUNITY to supply additional candidates. Further, if an agreement cannot be reached regarding the selection, the decision shall be left up to the Court.

(1) Qualified candidates for the CAM position must have expertise and competence in the regulatory programs under U.S. and international environmental laws, and have expertise and competence in waste stream evaluation, monitoring and control technologies, with a primary emphasis on engine room and machinery space operations, used by INTERUNITY to achieve and maintain compliance in respect to INTERUNITY seagoing vessels subject to this ECP. The CAM shall also have sufficient expertise and competence to assess whether INTERUNITY has an adequate Environmental Management System in place to assess regulatory and ECP compliance, to correct non-compliance, and to prevent future non-compliance.

(2)     The CAM must not directly own any stock in INTERUNITY, any of its subsidiaries, affiliated business entities (owned wholly or partially by INTERUNITY) or any agents of INTERUNITY, and must have no other direct financial stake in the outcome of duties conducted pursuant to this Plea Agreement. The CAM must be capable of exercising the same independent judgment and discipline that a certified public accounting firm would be expected to exercise in auditing a publicly held corporation. If INTERUNITY has any other contractual relationship with the CAM, both INTERUNITY and the CAM shall disclose to the United States such past or existing contractual relationships.

(3)     Each CAM candidate shall provide to the United States: a description of the candidate's qualifications and credentials, including subject matter, compliance, and linguistic expertise, experience or expertise in MARPOL and/or APPS, and experience serving as a monitor or advising a company in responding to a monitor; a brief description of the other members of the candidate's proposed team and their proposed roles, if any; a description of any past, present, planned, or under-consideration business, financial, or close personal relationship that the candidate, the candidate's firm, and the candidate's team members had or has with the defendant or the United States; verification that the candidate, the candidate's firm, and/or the candidate's team members (if any) have no conflicts of interest with regard to this matter or that any conflict has been waived; and an overview of the candidate's plan, personnel, and budget for the monitorship.

(4)     If the United States determines that the proposed CAM does not reasonably meet the qualifications set forth in the previous paragraphs, or that past or existing relationships with the CAM would affect the CAM's ability to exercise the independent judgment and discipline required to conduct the ECP review and evaluation, such CAM shall be disapproved and another CAM shall be proposed by INTERUNITY within thirty (30) days of INTERUNITY's receipt of the United States' disapproval.

**G.     THE AUDITS**

(1)     During the first year of probation, the TPA shall conduct a round of audits of INTERUNITY operations (vessel and shore side) including thirty-three percent (33%) of INTERUNITY Covered Vessels while the vessels are underway, to the maximum extent practicable. These audits should take place on voyages of short duration (2-3 days) to the maximum extent practicable. INTERUNITY and the TPA shall coordinate the audits to accommodate, as much as practicable, the vessels' operations and schedule. The audits shall be performed to ascertain and evaluate various aspects of INTERUNITY vessels: their systems, equipment and components; current practices whether documented or not; and the knowledge, skills, and abilities of ship and shore side personnel as they relate to the requirements of this ECP, and other applicable maritime environmental protection requirements. During the second year of probation, the TPA shall conduct a second set of audits of thirty-three percent (33%) of the Covered Vessels. These audits should take place on voyages of short duration (2-3 days) to the maximum extent practical. During the third year of probation, final audits shall be carried out as per paragraph I "FINAL EMS/ECP COMPLIANCE AUDIT" below.

(2)     The audits performed pursuant to this ECP shall exceed a typical SMS audit in scope and will be used to determine practices, procedures and equipment conditions not typically documented during a routine inspection by the classification society, port or flag state. The results of the audits will be used to shape and revise the Environmental Management System established by this ECP.

(3)     The audits shall meet the following specific requirements:

a.     It shall assess all waste streams developed from any system, equipment and components found in each machinery space on board INTERUNITY vessels. This will include observation and documentation describing the status and quantity of leakages apparent on each system that can contribute to bilge loading. The audit will determine the status and quantify leakages stemming from:

i.          all pump and valve seals and glands during operation,
ii.         all piping systems, flanges, gaskets, fittings and joints,
iii.        all equipment casings such as main and auxiliary engines, and reduction gears,
iv.        operation of engines, boilers, incinerators, and evaporators,
v.         all cargo tank stripping lines and ODME systems, and
vi.        all other mechanical components found aboard INTERUNITY vessels.

b.     It shall assess the adequacy and performance of the Oily Water Separator (OWS) and Incinerator, Sewage System, ODME system, and any other pollution prevention equipment to handle the quantities and types of wastes developed during normal operations. To assess the performance of the OWS, the TPA shall conduct an

12

operational test using the normal tank or bilge well supply as would be used in normal operations. The supply tank or bilge well must not be diluted. It will include an evaluation of the capacities for all tanks or containers associated with the management of sludge, bilges and oily wastes or other wastes. It will include an evaluation of documentation tracking, maintenance and repair, and modifications of all pollution prevention equipment, and notification of equipment failure to the CM, CAM, and other shore side personnel.

c.      Assess each vessel's crew ability to handle the operational, maintenance, and repair workloads in maintaining all systems, equipment, and components onboard in order to minimize waste stream development to as low as reasonably practical.

d.      It shall assess the adequacy of the policy, procedures, current practices and equipment, including storage capabilities used to manage shipboard solid wastes generated in all areas of the vessel and the effectiveness of garbage management plans.

e.      It shall assess the adequacy of the policy, procedures, current practices and equipment associated with cargo management developed during all evolutions of cargo operations.

f.      It shall assess the ability of each vessel's crewmembers to create, devise or implement an unauthorized process to dispose of a shipboard waste including regular garbage, machinery space and cargo-generated wastes.

g.      It shall assess the adequacy of each vessel's responsible crewmembers to maintain the following records and shall include a complete comparative analysis (against each other where possible) of the following records:

(i)      Oil Record Book,
(ii)     Engine Room Alarms,
(iii)    Tank sounding logs (if vessel does not maintain such a log, it      must start),
(iv)     Personal work records and lists related to pollution prevention   equipment,
(v)      Maintenance records related to pollution prevention equipment,
(vi)     Vendor service records related to pollution prevention      equipment,
(vii)    Bilge waste and sludge receipts,
(viii)   Deck Log,
(ix)     Garbage Record Book,
(x)      Oil to Sea Equipment Interface Logs,
(xi)     Hazardous waste manifests,
(xii)    Solid waste discharge receipts,
(xiii)   Content Monitor (OWS and ODME) calibration logs or annual      surveys by the makers,
(xiv)    Training records related to pollution prevention,

(xv)    Inspection Documents, and

(xvi)   SMS or SQE Audit documents

h.    It shall assess the adequacy of the policy, procedures, and current practices used to store and dispose of:

(i)      Solvents,

(ii)     Degreasers,

(iii)    Cleaning wastes,

(iv)     Batteries,

(v)      Paints,

(vi)     Oily rags,

(vii)    Fluorescent and incandescent bulbs,

(viii)   Expired boiler and engine chemicals,

(ix)     Used boiler and engine chemicals,

(x)      Galley greases,

(xi)     Pyrotechnics,

(xii)    Medical supplies,

(xiii)   Contaminate fuels,

(xiv)    Used Oil and greases,

(xv)     Incinerator ash,

(xvi)    Transformer oils,

(xvii)   Contaminated refrigerants

i.    It shall assess and evaluate documentation containing the certifications that each Covered Vessel's officers understand the requirements of this ECP and shall require signed statements by all vessel officers attesting that they understand false entries in the Oil Record Book for machinery space and deck/cargo space operations is a violation of law.

j.    It shall assess the policy, procedures, and current practices associated with the Master and Chief Engineer's capability to communicate with shore side personnel, including the CM and designated persons, and shall review such communications.

k.    It shall assess the frequency and adequacy of, through interviews of crewmembers, shipboard pollution prevention and environmental protection meetings and training.

l.    It shall assess the policy, procedures, and current practices used on Covered Vessels and ashore to track crewmember environmental training, as well as the availability of and access to training resources.

m.    It shall assess the adequacy of existing methods for employees to report environmental concerns and evaluate the capability of a reporting individual to

remain anonymous, and review processes of handling environmental complaints from crewmembers and shore side personnel.

n.      It shall assess the policy, procedures, and current practices to ensure that vessel vendors, technicians, and other non-crewmembers who are boarding and/or sailing with the vessels follow INTERUNITY requirements regarding pollution prevention and environmental protection.

o.      It shall assess the policy, procedures, and current practices used to manage the existing seal tracking and valve locking program, including the storage of seals and preventing the use of duplicate seals.

p.      It shall assess the policy, procedures, current practices, and equipment used to maintain refrigeration units, including availability and status of refrigerant recovery units, procedures for recovering refrigerants, and maintenance of a leak log.

q.      It shall assess the policy, procedures, current practices, and equipment related to Oil Transfer Procedures, including slops discharges, conditions of hoses, connections and transfer equipment, and shall include reviews of Declarations of Inspections.

r.      It shall assess the policy, procedures, current practices, and equipment used to handle emergency releases of hazardous fluids or pollutants on deck or within machinery spaces of vessels, including a review of the shipboard oil pollution emergency plans and evaluation of personnel performing such duties.

s.      It shall assess the policy, procedures, and current practices associated with ballast water management and invasive species requirements.

t.      It shall include a survey of all engineers serving onboard covered vessels at all levels for information on how to make the OWS, OCM, associated systems and waste management processes tamperproof and for methods on reducing or handling waste accumulations within machinery spaces. Participation shall be mandatory for all engineering personnel. The survey shall request the opinions of the vessels' engineers into their ability to adequately maintain the vessel systems, equipment and components. The survey will emphasize non-retaliation for open and honest opinions and reports of current noncompliant circumstances. The responses will be maintained in original format and made available to the CAM. The original survey responses shall be included in the Report of Findings.

(4) At the conclusion of the first year of audits, the TPA shall prepare a Report of Findings. If the TPA believes that additional time is needed to analyze available information, or to gather additional information, or to complete the Report of

Findings, INTERUNITY may request that the Government grant the TPA such additional time, as required, which request shall not be unreasonably denied. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Report of Findings. The Report of Findings shall be provided to INTERUNITY, the CAM, and the United States. Based on the Report of Findings, INTERUNITY shall develop and or update the Environmental Management System (EMS) as described below.

a.     Expertise and competence in the regulatory programs under United States and international marine safety and environmental laws; expertise and competence to assess whether INTERUNITY has adequate management systems in place to ensure applicable regulatory compliance, correct non-compliance, and prevent future non-compliance; and demonstrated capability to evaluate INTERUNITY's required effort and commitment in satisfying the requirements of this ECP and the EMS. INTERUNITY shall ensure that the TPA is provided all reports and notifications as established in this plan.

(5)     The CAM shall be assigned the following tasks and responsibilities and provide written submissions to the Court as set forth below:

a.     Review the relationship between INTERUNITY and the TPA and evaluate the adequacy of measures taken to ensure that the TPA acts with independence.

b.     Conduct a review and submit an annual report to the United States, the Probation Office, and INTERUNITY regarding each of the audits conducted pursuant to the Plea Agreement and the ECP. The CAM's reports shall provide a summary of the findings regarding the adequacy of any audits required by this ECP and adequacy of recommendations for change, as found necessary.

c.     The annual report shall also include and address any other information that the CAM is aware of which pertains to INTERUNITY's capabilities to meet the objectives of this ECP or any other marine environmental protection requirements.

(6)     If the CAM receives information regarding a direct violation of any applicable existing marine environmental protection requirement or requirement of this ECP, the CAM must immediately report the occurrence to the United States. At any time during the probationary period the CAM may inspect or investigate any aspect of the TPA's activities as they relate to the requirements of this plan or with respect to INTERUNITY's operations, and shall be provided full access to all records, audit personnel, vessels and shore side facilities as is necessary to perform its duties.

(7)     The CAM shall provide any additional reports, in both electronic and hard copy form, to the United States and INTERUNITY as requested by the

Court or as appropriate and to include inadequacies in the audit process, violations of the terms and conditions of the ECP and EMS and any other findings of significant problems or deficiencies.

(8)    All audits performed by the TPA shall take place during an underway voyage to the maximum extent possible since that is the best way for auditors to observe ship operations and personnel. As set forth herein, the TPA is encouraged to conduct underway audits during voyages of short duration (2-3 days) to the maximum extent practical. If this is found impractical within the specified time-frame, then the CM or TPA may notify the Government and the CAM and request an exception such as auditing a different vessel, auditing at a different time, or conducting the audit when the vessel is in port. The TPA and CM should communicate frequently regarding ship movements so that the TPA can plan accordingly. Requests for exceptions should not be unreasonably refused by the interested parties.

## H.    ENVIRONMENTAL MANAGEMENT SYSTEM MANUAL

(1)    Within nine (9) months of receiving the Report of Findings for the first round of audits from the TPA, INTERUNITY shall prepare and/or update the procedures contained in the EMS, which shall describe and document the EMS and contain any additional EMS implementation schedules as needed to ensure complete compliance in all operations and procedures. If INTERUNITY believes that additional time is needed to analyze available information or to gather additional information to prepare and/or update the EMS, INTERUNITY may request that the Government grant it such additional time as needed to prepare and submit the EMS, which request shall not be unreasonably denied. If necessary, the United States may grant additional time in thirty (30) day increments for completion and/or update of the EMS.

(2)    INTERUNITY shall submit a proposed final EMS to the CAM, the TPA, and the United States immediately upon its completion. The TPA and the United States shall provide comments on the proposed final EMS within ninety (90) days of receipt unless additional time for review is requested in writing. INTERUNITY shall submit a supplement to the EMS or a written response, as appropriate, within ninety (90) days of receipt of the comments. The EMS is subject to final approval from the United States, which approval shall not be unreasonably withheld.

(3)    All elements of the final EMS shall be fully implemented no later than nine (9) months following final approval by the United States. Upon receipt of final approval, INTERUNITY shall immediately commence implementation of the EMS in accordance with the schedule contained in the EMS Manual. INTERUNITY shall submit reports to the United States beginning no later

than one hundred twenty (120) days following the publication of the Report of Findings by the TPA regarding the status of the development and implementation of the EMS and the results of the Review and evaluation of INTERUNITY operations or audits conducted pursuant to the EMS. These reports shall be made on an annual basis.

## I.   FINAL EMS/ECP COMPLIANCE AUDIT

(1)    Beginning no later than twenty-four (24) months from the date of sentencing, INTERUNITY shall arrange for, fund and complete a Final EMS/ECP Compliance Audit for the remaining thirty-three percent (33%) of INTERUNITY covered vessels that were not audited during the first two years of probation. These audits should take place on voyages of short duration (2-3 days) to the maximum extent practical. The audits are to be conducted to verify compliance with applicable environmental laws and regulations and the requirements of this EMS and ECP. During this final audit phase INTERUNITY shall immediately advise the CAM and the Government of any issue that comes to its attention that adversely impacts INTERUNITY's compliance with all applicable laws and regulations and the EMS/ECP.

(2)    The TPA will be certified by the American National Standards Institute Registration Accreditation Board or will have compatible credentials and experience in performing EMS/ECP audits.

(3)    The Final EMS/ECP Compliance Audits shall be conducted, as much as is practicable under the circumstances, in accordance with the principles set forth in ISO 9000 and ISO 14011, using ISO 14012 as supplemental guidance, and shall assess conformance with all requirements presented in the EMS and with the additional requirements of this plan. Designated United States representatives may participate in the audits as observers at Government expense. INTERUNITY shall make timely notification to the United States regarding audit scheduling in order to make arrangements for observers to be present.

(4)    The TPA shall deliver each vessel's and facility's audit report to the CM upon completion. In addition, the TPA will deliver an Audit Report to the United States within thirty (30) days after the completion of each audit. If the TPA believes that additional time is needed to analyze available information or to gather additional information, INTERUNITY may request that the Government grant the TPA such additional time as needed to prepare and submit the Audit Report. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Audit Report.

(5)    The Final EMS/ECP Compliance Audit Reports shall present the Audit

Findings and shall, at a minimum, contain the following information:

(a)     Audit scope, including the time period covered by the audit;

(b)     The date(s) the on-site portion of the audit was conducted;

(c)     Identification of the audit team members;

(d)     Identification of the company representatives and regulatory personnel (if any) observing the audit;

(e)     The distribution list for the Final EMS/ECP Compliance Audit Report;

(f)     A summary of the audit process, including any obstacles encountered;

(g)     Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

(h)     Identification of any Audit Findings corrected or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented;

(i)     Certification by the TPA that the Final EMS/ECP Compliance Audit was conducted in accordance with this document and general audit principles.

(6)     Within ninety (90) days from completion of the Final EMS/ECP Compliance Audit of a particular facility or vessel, INTERUNITY shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing INTERUNITY into full compliance with all applicable laws and regulations and the EMS/ECP to the extent not already completed. The Action Plan shall include the result of any root-cause analysis, specific deliverables, responsibility assignments, and an implementation schedule. INTERUNITY may request that the United States permit a brief extension of the time limit stated above on a case by case basis. Such permission shall not be unreasonably withheld.

(7)     The Action Plan shall be reviewed by the United States which shall provide written comments within thirty (30) days of receipt. After making any necessary modifications to the Action Plan based on the comments, INTERUNITY shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty (30) days after all items in the Action Plan have been completed, INTERUNITY shall submit a written Action Plan Completion Confirmation to the United States.

## J.   NON-COMPLIANCE

a.    This EMS/ECP does not in any way release INTERUNITY from complying with any applicable international conventions and treaties, State or Federal statutes and/or regulations, the ISM Code,  or other applicable international maritime conventions or treaties and does not limit imposition of any sanctions, penalties, or any other actions, available under those international conventions and treaties, State or Federal statutes and regulations, the ISM Code, or other international maritime safety conventions or treaties.

b.    The EMS/ECP shall be part of the Plea Agreement and adherence to it will be a condition of  probation. Failure to comply with any part of this EMS/ECP may be considered as Non Compliance.  INTERUNITY within ninety (90) days from the identification of Non Compliance shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing INTERUNITY into full compliance. The Action Plan shall be reviewed by the United States which shall provide written comments within thirty (30) days of receipt.  After making any necessary modifications to the Action Plan based on the comments, INTERUNITY shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty (30) days after all items in the Action Plan have been completed, INTERUNITY shall submit a written Action Plan Completion Confirmation to the United States.  Failure of INTERUNITY to implement agreed Action Plan may be a violation of the Plea Agreement and may be grounds for the revocation or modification of INTERUNITY's probation. Should the United States seek to revoke or modify INTERUNITY's probation based on INTERUNITY's refusal to pay valid charges for the TPA or CAM and/or its failure to provide the TPA or CAM access to vessels, facilities, personnel, or documents, and/or as the result of any disagreement regarding any of the provisions of this EMS/ECP, INTERUNITY shall have the right to fully contest such revocation before the appropriate U.S. District Court.

## K.   CM/VESSEL MASTER RESPONSIBILITIES

The Master of any INTERUNITY vessel covered under this ECP, shall ensure that timely reports are made to the CM of any non-complaint condition of any INTERUNITY vessel. The CM shall ensure that timely reports are made to the United States of any non-compliant condition of any of INTERUNITY vessel. INTERUNITY shall establish that enforcement of and employee  compliance with the EMS/ECP, ISM Code, MARPOL, and all applicable State and Federal safety and environmental statutes and regulations is an important positive factor and that failure to  comply with such policies, regulations, and laws will be a negative factor in all appropriate personnel evaluations.

## L.   BOARD OF DIRECTORS

INTERUNITY shall ensure that at least yearly INTERUNITY's MD receives and reviews reports from the CM and any applicable report from the TPA and CAM concerning the implementation of this EMS/ECP, including environmental compliance, EMS implementation, and manager, officer, and crew training. Copies of those portions of the meeting agendas and internal company reports concerning these items shall be included in the reports to the United States.

## M.   TRAINING REQUIREMENTS

(1)   The CM will be responsible for developing training programs to educate and train INTERUNITY Covered Vessels and shore-side employees associated with the operation and management of its Covered Vessels. INTERUNITY will appoint a Fleet Training Officer, who may be the CM, to ensure that the requirements of this section are met.

(2)   Training shall occur annually for all employees and be performed by qualified instructors before an employee assumes his or her duties. The training shall consist of pertinent sections of this ECP, the EMS, and existing marine environmental protection requirements. The training shall include shipboard-related technical and practical information associated with pollution prevention and the operation, maintenance and repair of pollution prevention equipment and systems, and be appropriate for the work responsibilities and department in which an employee works. The training must include discussion of the consequences to INTERUNITY and its employees for failure to comply with the requirements of this ECP, EMS, and existing marine environmental protection requirements.

(3)   A basic initial training program shall be provided to Covered Vessels employees currently onboard vessels in an effort to promptly mitigate pollution risk and ensure environmental protection. Additionally, employees must receive shore side training prior to returning to a vessel on a new contract.

(4)   The training shall include instruction regarding:

(a)   Corporate environmental compliance structure, including the CM and contact information.

(b)   Comprehensive overview of this ECP, the EMS, and other marine environmental protection requirements.

(c)   The reporting system used to report non-compliance.

(d)   Sanctions and consequences for violations such as remedial training, suspension, termination, and civil and criminal liability.

(e)     Pollution prevention and minimization programs specifically relating to steward, deck, and engine department procedures and operations.

(f)     All requirements set forth in the Engineering section of this ECP.

(g)     Position specific training in the operation, maintenance and repair of oily water separators, incinerators, oil content discharge monitoring equipment, and other pollution prevention equipment.

(h)     Procedures for solid and hazardous waste segregation and storage, disposal, and reporting of releases.

(i)     All other shipboard environmental protection related procedures examined and described in the required initial review.

(5)     All new crewmembers reporting to work onboard INTERUNITY Covered Vessels shall receive training within fourteen (14) days of beginning to work on board the vessel. INTERUNITY shall maintain documentation onboard each Covered Vessel verifying that all officers and crewmembers working on the vessel have received the required training. Such documentation shall be made available to the TPA, CAM, and the United States upon request.

(6)     The Chief Engineer and Chief Officer onboard each Covered Vessel listed shall prepare independent written verification that all engine room and deck crew members have received the training required by this EMS/ECP. All engine room crewmembers shall sign and date a statement acknowledging completion of the training. This written verification, together with the signed acknowledgment, shall be completed semi-annually and maintained in the engine control room of each vessel.

## N.     ENGINEERING REQUIREMENTS

(1)     Time of Implementation. Unless otherwise stated, all of the Engineering Requirements set forth below shall be implemented on Covered Vessels as soon as is reasonably practicable, but in any event not later than six (6) months from the date of sentencing.

(2)     Environmental Control System

a.     INTERUNITY shall implement an Environmental Control System or ECS to help prevent unauthorized usage of connections within the engine room, machinery spaces, and cargo/deck spaces. Under the ECS, INTERUNITY shall require crew members to use numbered seals, locks, or welds (on flanges) to prevent the

unauthorized connection to, and discharge through, piping systems that are or may be connected to the oily bilge system or and overboard discharge connections, to include those used in cargo tank stripping/washing. Seals used as part of the ECS shall be non-reusable and uniquely numbered.

b.      An ECS Seal Log shall be maintained by the Chief Engineer that records each time a seal is affixed or removed in the engine room and machinery spaces, including the date, time, seal number removed, seal number affixed, personnel involved, and reason for any seal removal or replacement. The keys used to open locks utilized as a part of the ECS shall be controlled. This ECS Seal Log shall be different from the ECS Seal Log used by the Chief Officer in the cargo and deck spaces.

c.      An ECS Seal Log shall be maintained by the Chief Officer that records each time a seal is affixed or removed in the cargo or deck spaces and pump room, including the date, time, seal number removed, seal number affixed, personnel involved, and reason for any seal removal or replacement. The keys used to open locks utilized as a part of the ECS shall be controlled. This ECS Seal Log shall be different from the ECS Seal Log used by the Chief Engineer in the engine room and other machinery spaces.

d.      Any existing seals that are found to have deteriorated or had their numbers partially or completely erased shall be replaced immediately, with the reason for replacement entered in the respective ECS Seal Log.

e.      The CM will be responsible for ensuring that no duplication of ECS seal numbers occur and will maintain documentation indicating which series of environmental seals have been supplied to each vessel.

(3)     Tank Piping

a.      To prevent unauthorized manipulation of waste management systems within the engine room and machinery spaces, each Covered Vessel shall maintain Classification Society-approved drawings that reflect all approved modifications made to waste management systems.

b.      INTERUNITY shall establish and maintain approval procedures for any modifications made to shipboard waste management tanks or their systems. Those procedures shall require prior CM approval for all non-emergency modifications. Any emergency modification must be reported to the TPA and CAM promptly after work is performed. Prompt approval or removal of any emergency modifications after the emergency has ended shall be required.

c.      Within thirty (30) days of sentencing, the CM shall ensure that notification is given to all Covered Vessels regarding the prohibition against using unauthorized

stub pipes, cross connections, or piping on engine room waste and cargo tank stripping/washing systems.

d.     Personnel working on Covered Vessels shall promptly notify the CM of the existence and purpose of any unauthorized stub pipes, cross connections, or piping on engine room waste and cargo tank stripping/washing systems in a Covered Vessel. Within fourteen (14) days of receiving such information, the CM shall ensure that it is relayed to the Interested Parties, along with any findings and corrective actions.

e.     Classification Society-approved drawing(s) representing the current physical layout of the systems shall be available on board. The Chief Engineer shall maintain documentation explaining the reason(s) for any changes/modifications made after the date of sentencing for engine room/machinery space systems. The Chief Officer shall maintain documentation explaining the reason(s) for any changes/modifications made after sentencing for cargo tank stripping/washing systems. Copies of this documentation and drawing(s) shall be maintained aboard the vessel and provided to the TPA and CAM upon request.

f.     To prevent unauthorized usage of bilge water tanks or oily waste tanks, INTERUNITY shall require that ECS seals or locks be placed on all tank hatches, valves, or flanges that could allow for an external connection to the system. The ECS Seal Log or Lock Log shall track any time a processed bilge water tank or oily waste tank is opened.

(4)     Bilge-Main Cross Connections

a.     Within sixty (60) days of sentencing, the CM shall ensure that notification is provided to all Covered Vessels regarding the prohibition against the non-emergency usage of cross connections from engine room bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump" or "fire, bilge and ballast" pump. The notification shall state that such usage is similar to bypassing the OWS equipment and is strictly prohibited, except in the case of an emergency. Any method to discharge overboard via the soot collection tank and soot eductor must be disabled and locked out.

b.     The deck plates above or near the locations of these cross connections or other interconnected systems and the valve bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three inch letters shall be permanently fixed nearby, stating – "Bilge System Piping Crossover – Emergency Use Only."

c.     To prevent unauthorized usage of those valves, INTERUNITY shall require that ECS seals be placed on such valves. The ECS Seal Log shall track any time a

crossover to the bilge main is opened. If a valve is remotely operated from the engine control room, the associated push button or switch must be unable to be used without breaking an environmental seal

(5)     Emergency Bilge Suctions

a.     All other bilge suction valves not connected to the bilge main, and independent emergency suctions to the vessel's engine room bilges, like those which may be connected to sea water circulating pumps, shall be painted international orange on all Covered Vessels and labeled in a manner similar to "Emergency Bilge Suction - Emergency Use Only." The valve wheels will also have a numbered and logged ECS seal capable of breakaway during emergencies, testing, and maintenance.

(6)     Blank Flanges

a.     To prevent unauthorized connections within the engine room and machinery spaces of vessels, every blank flange connected to overboard piping, on systems such as salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed, or fitted with numbered ECS seals through the flange bolts that will break when such bolts are removed, to prevent unauthorized connections and discharges. The ECS seals used shall be numbered and records kept in the ECS Seal Log. Alternative sealing methods, such as numbered foil-coated sticker seals for flanges, may also be used.

b.     The blank flange securing the bilge and sludge transfer system shore connection discharge valve at the discharge stations shall also require controls as part of the ECS.

(7)     Additional OWS / OCM Requirements

a.     The sample line from the OWS discharge connection to the sample/flush line control valve will be painted a bright color to distinguish it from other tubing and piping in the area. The line must be routed so it is clearly visible to the extent possible for its entire length. No additional connections or tees of any kind may be added to the line.

b.     INTERUNITY shall have the OCM manufacturer or contracted distributor perform annual testing that ensures the OCM requires a sample flow for normal operation and control.

c.     Every Covered Vessel shall perform monthly operational tests of the OWS and OCM in the presence of the Chief Engineer, and one other engineer. The test shall be logged in the vessel's ORB. The Chief Engineer shall send a report to the assigned superintendent and CM.

d.      In addition to the operational test performed in the presence of the TPA, every Covered Vessel shall conduct an annual operational test of the OWS system under actual operational conditions.  This test shall include one (1) full hour of continuous processing of the contents of the Bilge Holding Tank without dilution, and without dilution of the sample line leading to the OCM,[1] conducted by the Chief Engineer in the presence of a INTERUNITY shore-side representative or Class surveyor, and any other engine room personnel assigned responsibility for the operation and/or maintenance of the OWS.  If an actual discharge is not feasible due to the location of the vessel or the levels of the bilge holding tanks, then the discharges shall be through a recirculation line, in accordance with the procedures approved by the vessel's Classification Society and provided further that soundings of the bilge holding tanks shall be made before and after the test and shall be made a part of the test record and providing that any alarms shall be recorded and made part of the test record.  All of the above shall be recorded in the Oil Record Book (Part I).  In the event that the assessment determines the OWS is not operating as designed, then an immediate report shall be made to the cognizant superintendent, CM, the Interested Parties, the TPA, and the CAM, with a copy of the engine room alarm printout to be retained.

e.      Every Covered Vessel shall inspect the OWS source tanks every six (6) months and remove any accumulated oil if necessary.  The OWS source tanks shall be cleaned during dry docking or sooner if necessary.  Such cleaning shall be logged in the PMS.

f.      Anytime an OCM is subject to maintenance or calibration, such actions shall be logged in the ORB.

(8) Additional ODME Requirements Applicable Only to Tank Vessels (if any)

a.      INTERUNITY shall have the ODME manufacturer or contracted distributor perform annual testing that ensures the ODME requires a sample flow for normal operation and control.  Any ODME that allows overboard discharge without a sample flow is prohibited.

b.      Every Covered Vessel shall perform monthly operational tests of the ODME in the presence of the Chief Officer, and one other officer.  The test shall be logged in the vessel's ORB.   The Chief Officer shall send a report to the assigned superintendent and CM.

c.      As part of the operational test performed in the presence of the TPA, every Chief Mate/Officer and any other officer responsible for ODME operation shall demonstrate that they understand how to properly operate the system, to include discharging through the ODME in "Automatic" mode. The Chief Officer and any other

---

[1] A test performed where the source tank is diluted with water or does not contain bilge water is strictly prohibited.

26

officers responsible for ODME operation shall demonstrate to the TPA's satisfaction that they understand how to operate the ODME, and that they understand that discharges through the ODME in "Manual" mode are prohibited.

d.      Anytime an ODME is subject to maintenance or calibration, such actions shall be logged in the ORB.

(9)  Recordkeeping

a.      All sounding records required by this section shall be maintained and available to auditors for the duration of the ECP.

b.      A portable pump log shall be maintained documenting all instances of onboard use of a pneumatic or portable pump.  The log shall include a description of the fluid pumped, its source, and the tank or location where the fluid was transferred.  The log shall include the date and time the pump was used and shall identify the person(s) who checked out the pump and operated it.

(10)  Oil Record Book Entries

a.      Entries made into the ORB shall be made and signed by the officer or officers in charge of the operation, reviewed and countersigned by the Chief Engineer (for ORB Part I) or Chief Officer (ORB Part II), and each completed page shall be signed by the Master.

(11)  Tank Sounding Records

a.      INTERUNITY shall provide each Covered Vessel with a standard format electronic tank sounding log that includes, for each sludge tank, bilge tank associated with bilge water and/or oil residues (sludge), and cargo waste/washing/stripping tank, the tank name/designation, tank capacity, sounded quantity and time and method of sounding.  Soundings from each tank shall be taken at least daily.  The individual taking the tank sounding shall make entries in the electronic tank sounding log and sign each entry electronically.

(12)  Fuel Oil/Lube Oil Purifier Settings and Line Breaks

a.      INTERUNITY shall have a standard system for monitoring fuel oil and lube oil management on a monthly basis, including the operation of the fuel oil and lube oil purifiers. Any incident involving ships receiving proven poor quality fuel shall be noted in the Engine Room Log or similar record once it becomes known, and such entries shall refer to the relevant bunker receipts.

b.      Any extraordinary operations (such as increased frequent draining of fuel oil service and settling tanks, draining engine lube oil sump tanks of excessive water) shall be recorded in the official Engine Room Log and explained to the extent possible, and the records made available for inspection.

c.      All oil leaks exceeding manufacturer or historical volumes, including any fuel and/or lubricating oil leaks resulting from mechanical failure shall be reported to the CM.

(13) Oil-to-Sea Interfaces

a.      INTERUNITY shall establish a logbook for each Covered Vessel for monitoring equipment having oil-to-sea interfaces which relies on mechanical tension, hydrostatic pressure on the seal and the surface tension between water and oil to minimize oil releases to the sea.  Such interfaces may include stern tube bearings, stabilizers, controllable pitch propeller systems, maneuvering thrusters, propulsion pods, and similar equipment whereby the leakage of a sealing component may cause a loss of operating medium into the waters surrounding the vessel.  Any replenishment of oil into the head tanks, operating systems reservoirs, or other receivers associated with this equipment shall be logged, regardless of the quantity involved.  Ingress of water or drainage of water into or from these systems must also be logged, as far as practicable.

b.      Any extraordinary operations (such as frequent draining of interface operating systems, tanks and spaces of excessive water) shall be recorded in the official Engine Room Log, explained to the extent possible, and the records made available for inspection.

(14) Fleet Operational Survey

a.      Within six (6) months of the date of sentencing, INTERUNITY shall issue a survey to all Masters on its Covered Vessels for information on how to improve MARPOL compliance, to include what new equipment, maintenance, parts, and procedures would be beneficial.  This survey shall include a request for the frank opinions of the vessels' officers as to their ability to adequately maintain the vessels' systems, equipment, and components will be included.  The survey will emphasize non-retaliation for open and honest opinions and reports of current noncompliant or unsatisfactory circumstances.

b.      The CM shall evaluate the responses and establish a plan to evaluate, test, and implement viable ideas for improvement.  The CM shall also address, to the extent practicable, legitimate maintenance concerns suggested by the vessels' Masters and Officers.

c.    A summary of the reported information and corrective actions will be provided to the Interested Parties, the CAM, and the TPA.

## O.    DOCUMENTATION AVAILABLE FOR INSPECTION

The CM shall ensure that all documentation required by this EMS/ECP is maintained and available for inspection by the TPA and CAM and the United States. The Master of each Covered Vessel under this ECP, shall maintain on board the vessel, all records required by International conventions and treaties including SOLAS, the ISM Code, and MARPOL and applicable State and Federal statutes and regulations and any additional documents required under this EMS/ECP, such as crew training records, and will make these records available to the TPA and CAM and the United States upon request. A summary of this information and any explanation, where appropriate, shall be included in the reports to be submitted to the United States by the TPA.

## P. CHANGES TO OPERATION/MANAGEMENT

The parties recognize that during the term of probation, the number and identity of vessels operated and/or managed, by INTERUNITY may increase or decrease. Any vessel, the operation or management of which is assumed by INTERUNITY and that will call at United States ports shall be subject to the terms and conditions of this EMS/ECP. Any vessel removed from the operation or management by INTERUNITY shall be excluded from the scope of the EMS/ECP. INTERUNITY agrees that it will immediately (but in no event later than twenty (20 working days, excluding weekends or holidays, following a change) notify the United States of any change in name, flag of registry, recognized organization, ownership or class society of any such of INTERUNITY vessels, to include the operation or management of which is assumed by INTERUNITY. INTERUNITY agrees that this EMS/ECP shall remain in effect for all of the aforesaid vessels regardless of changes in the vessels' flag of registry, recognized organizations, name, or class society, so long as the vessels are managed or operated by INTERUNITY and may call at United States ports. INTERUNITY shall notify the United States before any vessel is released from the requirements of the EMS/ECP due to a change in operation or management. INTERUNITY shall ensure that any vessel that it assumes operational or management, of during the course of probation is audited in accordance with this ECP, and that this audit takes place no later than one hundred and eighty (180) days after assuming technical management of the vessel.

## Q. SELF-ENFORCEMENT

INTERUNITY further agrees that it will undertake and implement the necessary procedures to ensure that this EMS/ECP is diligently complied with.

## R. REVISIONS/MODIFICATIONS

The requirements of this EMS/ECP, including the dates and time periods mentioned herein, shall be strictly complied with. Should INTERUNITY be unable to comply with any of the deadlines, INTERUNITY shall immediately notify the United States in writing of the reason(s) for non-compliance, and propose a revised timetable. The United States shall then determine whether the revised timetable should be accepted.

## S. REPORTS

All reports, documents and correspondence required under this EMS/ECP to be sent to the United States shall be sent to the following offices:

(a)   U.S. Department of Justice
      Environmental Crimes Section
      Attn: Stephen Da Ponte
      150 M Street, NE, Suite 4.126, Washington, D.C. 20002
      Email: Stephen.daponte@usdoj.gov

(b)   U.S. Attorney's Office
      Southern District of California
      Attn: Melanie K. Pierson
      Assistant United States Attorney
      Federal Office Building
      880 Front Street, Room 6293
      San Diego, California 92101-8893
      Email: Melanie.Pierson@usdoj.gov

(c)   U.S. Coast Guard Commandant (CG-INV-1)
      Office of Casualty Investigations & Analysis
      Attn: Designated Representative of the Coast Guard  2703 Martin Luther King Jr. Ave, SE Stop 7501
      Washington, D.C. 20593-7501
      Email: HQS-SMB-CG-INV-ECP@uscg.mil (less than 10GB)

(d)   U.S. Probation Department
      Southern District of California